A. P. SHATTUCK vs. T. C. DANIEL and G. V. YOUNG.

1. OFFICIAL ACTS DURING WAR: *Validity thereof.*

All the public acts of the insurgent states, legislative, executive, and judicial, done after the overthrow of the national authority, within their respective limits, are valid, if within the limits of state power, unless repugnant to the constitution of the United States, the laws passed in pursuance thereof, or in aid of the war against them. When an official act of those then in the state or municipal administration is brought into question, if it shall be determined to be purely of a domestic, internal character, parcel of the ordinary civil administration, it should have force and effect as if done now or before the war. All taxes imposed and collected during the war, for military purposes, were illegal.

2. TAXES: *Where part legal and part illegal.*

Where the taxes are mixed, part being legal and part illegal, they cannot be separated, and a sale for the collection of such mixed taxes is void.

APPEAL from the Chancery Court of *Colfax* County.

Hon. AUSTIN POLLARD, Chancellor.

The facts in the case are sufficiently set forth in the opinion of the court.

It is assigned for error, as follows:

1. The court erred in sustaining the demurrer of defendants to the bill of complaint.

2. The court erred in dismissing the bill of complaint.

*Becket & Little*, for appellant :

The 1st, 2d, and 3d grounds of the defendants' demurrer, claiming that the tax sale in 1862, for the taxes of 1861, was in aid of the rebellion, and void, is untenable.    See Dogan *v.* Martin, 48 Miss., 11.

The 4th ground is not well taken.    There was a tax sale in 1862 and in 1869 ; that the land had never been redeemed, and complainant purchased it in 1870.    Under art. 1, p. 306, Code, 1857, as construed in Cassidy *v.* Jackson, 45 Miss., 397, the doctrine of maintenance and champerty are not in force in this state.    The state may sell before the period limited for redemption.    Belcher *v.* Mhoon, 47 Miss., 613.

The state sold all the title it had to Shattuck (Code, 1857, art. 7, p. 307, and arts. 16, 17, ib.), and, if the land was not redeemed, the right would inure to him.    Nixon's Heirs *v.* Carcos' Heirs, 28 Miss., 414.    And the title which accrued to the state, by sale for taxes in 1869, became a perfect title.

*Houston & Reynolds*, for appellees :

The state acquired no title to the land.    The taxes for 1861, for which the land was sold in 1862, were, in part, in aid of the rebellion, and this is not a question of fact to be set up by answer.    The state government was then insurrectionary. M. C. R. R. *v.* The State, 46 Miss., 220 ; Thomas *v.* Taylor, 42 ib., 46 ; ib., 157.    A tax sale illegal in part, is illegal *in toto*.    Keuper *v.* McLellan, 19 Ohio, 324 ; Hayden *v.* Foster, 13 Pick., 492 ; Long *v.* Davis, 4 Mich., 140 ; Blackw. on Tax Titles, 159, 161, 280, 281 ; McLoughlin *v.* Thompson, 55 Ill., 249 ; Johnson *v.* Calhoun, 36 Vt., 693 ; 1 Greenl. 339 ; 2 ib., 375.

The state, in 1869, acquired a *prima facie* title, subject to be defeated by redemption.    The right to redeem continued two years after the sale.    Shattuck purchased one year after the sale.    No right had accrued.    Hopkins *v.* Sandidge, 31 Miss., 677.    The land was not subject to entry.    People *v.* Hammond, 1 Doug. (Mich.), 276 ; 19 Mo., 332 ; 2 N. Y., 62.

The state had no right to sell until August, 1870, and the sale to Shattuck, by the state, was a nullity.

SIMRALL, C. J., delivered the opinion of the court.

This was a suit in chancery, brought by A. D. Shattuck, to confirm a tax title.

The bill alleges that on the 7th of July, 1862, the land was sold to the state for the taxes due thereon for the year 1861 ; that the deed to the state was executed by the sheriff and tax collector on the 7th of July, 1862, which on the 10th of the same month was filed in the office of the probate clerk of Chickasaw county ; that it remained on file, uncanceled, until the 18th of January, 1868, when it was recorded.

On the 2d of August, 1869, the same land was again sold to the state for the taxes of the year 1868. On the 9th of the same August the deed was filed with the probate clerk of Chickasaw county, and, remaining there uncanceled until the 19th of August, 1871, was on that day recorded.

On the 22d of June, 1870, the complainant purchased the land from the state, and received a deed from her officer—the auditor of public accounts—which was, on the 7th of July thereafter, recorded.

The defendants demurred to the bill, assigning several causes—among others, because the taxes for which the lands were sold, in 1862, were in aid of the rebellion, and the sale is therefore illegal and void ; and because, at the time of the purchase by the complainant in June, 1870, the time for the redemption for non-payment of the taxes of 1868 had not expired, etc.

By reference to the revenue laws in force in 1861 we can discover the several elements and purposes for which taxation was imposed, and for which it was collected.

By ch. 11, p. 53 (pamphlet), there was imposed for the fiscal year 1861 a tax of 30 per cent. upon the regular state taxes, " for the support of destitute families dependent wholly, or in part, upon the volunteers who are or may be mustered

into the service of the state, or confederate states." By an act passed August 2, 1861, the boards of police where authorized to collect 100 per cent. of the state tax of 1859 to be applied to assist in furnishing outfits, equipments, clothing, etc., to volunteer soldiers in the state, or confederate states, or that may thereafter enter such service, and also to relieve the wants of their destitute families and dependents. Pamphlet, pp. 31, 32.

Included also in the taxes of that year were certain impositions made by the convention for military purposes.

Much the largest part of the taxes imposed and collected for the fiscal year 1861 were expressly for the purpose of aiding and supporting the war pending between the United States and the insurgent states and people, including Mississippi.

Immediately succeeding the close of the war there was much discussion in the courts, federal and state, as to the *status* and functional authority of the insurgent states after the overthrow of the federal authority, and before its restoration. The United States did not, in either its political or judicial departments, recognize any validity in the acts of secession, or any rightful legal authority as vested in the confederate government. Various and incongruous theories were put forward by jurists and judges. The times were not then propitious for calm and unimpassioned juridical discussions, and, as a consequence, inconsistent and conflicting resolutions were announced by judges.

But each discussion, especially when conducted with calmness, has contributed some light upon the subject, until now the judiciary of the country, federal and state, seem to agree with almost unanimity in the doctrine that all the public organized acts of the insurgent states—legislative, executive, and judicial—done after the overthrow of the national authority within their respective limits, are valid, if within the limits of the state power, unless repugnant to the constitution of the United States, the laws passed in pursuance thereof, or in aid of the war against them.

When, therefore, at this day an official act of those then in

the state or municipal administration is brought into question, if it shall be determined to be purely of a domestic, internal character—parcel of the ordinary civil administration—it should have force and effect as if done now or before the war.

In reviewing now the official acts and conduct of those who administered the local domestic authority of this state during the late war, the test to be applied, to fix the character of the act as valid or invalid, is such as has been suggested. Under that rule we are bound to hold that all taxes imposed and collected during that period, for military purposes, were illegal. It would follow that an enforced collection by sale would not impart a title to a purchaser. But these illegal taxes were mixed with others which were levied for the support of the ordinary legitimate purposes of the state. What effect does that have upon the sale made by the tax collector to the state in 1862? That query was propounded in Griffin v. Dogan & Martin, 48 Miss., 22. The court did not commit itself on the question, as appears from the sentence, "if there be anything in it (the point) the defendant may set it up by answer." Why reserve the point for further consideration, in the particular case, if the court meant to pass finally upon it then? There is, however, an expression of opinion by myself, that the legal tax may be separated from the illegal. Subsequent reflection, and the examination of the authorities, have satisfied us that the impression then expressed is erroneous. See Blackwell on Tax Titles, 160, and cases in notes. The analogy does not hold good between taxes for several purposes and several distinct executions under which the officer may sell. The rule is, where there are divers taxes all must be legal, otherwise the sale is void. It follows that the state acquired nothing by the purchase at the sale of 1862.

These proceedings being utterly void, the land remained to the original owner, unaffected by the sale. It continued to be subject to assessment as his property.

Under the statute of 1860, as construed in Griffin v. Dogan & Martin, already referred to, the state acquired a *prima facie*

title to the land, by the purchase, in 1869, for the taxes due
for 1868.  Having acquired no right under the sale and pur-
chase of 1862, as we have seen, the complainant has no title
unless he is invested with such as inured to the state by the
purchase of 1869.  The disposition of lands thus acquired by
the state is regulated by the statute.  The deeds are required
to be deposited with the probate clerk of the county, to
remain on file in his office for two years from the date of sale,
subject to redemption by the owner.  Within the two years
the owner may redeem on the terms prescribed.  Art. 39, pp.
80, 81, Code, 1857.  After the expiration of this time, if the
land is unredeemed, the title shall vest absolutely in the pur-
chaser, the deeds shall be recorded, " and the lands purchased
by the state shall *thereafter* be subject to entry by any citizen
of the state."  *  *  *  Art. 44, p. 82, Code, 1857.  The
purchaser at a tax sale acquires a contingent interest, subject
to be destroyed by redemption, but it becomes absolute after
the time has expired when he may demand the evidence of
his right, and when his deed may be recorded.  So long as
the right of the state continues in this inchoate condition " the
land shall not again be sold for taxes, nor shall the same be
disposed of by the state."  Arts. 44, 45.  But when the right
of redemption has been cut off, and not before, is the land
subject to entry by a citizen.

The complainant purchased from the state 22d June, 1870.
Less than a year had elapsed from the date of the sale, in
1869, to the time of complainant's purchase.

The authority of the auditor to make sale is conferred by
the statute—that is, after two years from the date of the
purchase by the state, if in the meantime there has been no
redemption.

We have seen that the state got nothing under the tax sale
of 1862.  She did acquire an inchoate title by the sale in
1869, which would have become absolute, as a title of *prima
facie* validity, after two years from that date.  But since the
auditor allowed the complainant to enter the land and become

a purchaser, contrary to the statute, it follows that he did not obtain the state's title. For these reasons we think the decree sustaining the demurrer and dismissing the bill is right.

Wherefore it is affirmed.