# CASES ARGUED AND DECIDED

# SUPREME COURT OF MISSISSIPPI

AT THE

## APRIL TERM, 1878.

---

LUCY E. WRIGHT AND HUSBAND *v.* SARAH J. WALTON AND HUSBAND.

1. MARRIED WOMAN. *Contract for plantation supplies.*
   To enable a married woman to contract for supplies for her plantation, under our statute, it is necessary that she should first have a plantation. And if she falsely represents that she has a plantation, and contracts for supplies therefor, she is not estopped by her representation to deny that such was the fact.

2. SAME. *Agency of the husband. Definition of "supplies."*
   Our statute makes the husband the general agent of the wife to contract for supplies for carrying on agricultural operations on her plantation, but his statutory agency is limited to contracting for such supplies. The Legislature intended the word "supplies," as used in this connection, to embrace such things as are necessary or adapted to the conduct of agricultural operations. The word "supplies," as used in the Code of 1871, was used with the same intent that the word "necessaries" was in the act of 1867 upon this subject. And whether an article falls within the class designated by the word "supplies," must be determined "by resort to the usages and customs of the agricultural interest."

3. SAME. *Her incapacity to borrow money.*
   A married woman cannot borrow money and bind her estate for the payment thereof, even though she should state, at the time of borrowing, that it was procured to be expended for the support of her family, or for supplies for her plantation, if she does not actually use it for such purposes. In order to bind the wife's estate for money borrowed by herself, or by the husband as her implied agent, it must appear that the money was used for some purpose for which she could contract under the statute.

(1)

4. SAME. *Agency of the husband. His contract for supplies.*

The husband is by law constituted the agent of the wife to buy supplies for her plantation, and if he buys for her plantation such things as are included within the term "supplies," he is then acting within the scope of his agency, and her property at once becomes liable for the debt thus contracted; and she cannot avoid the payment thereof by showing that her husband misapplied the articles bought, and she got no benefit therefrom.

APPEAL from the Chancery Court of Hinds County.

Hon. E. G. PEYTON, Chancellor.

Lucy E. Wright and her husband, Hamilton Wright, filed their bill in chancery against Sarah J. Walton and her husband, Charles A. Walton, for the purpose of subjecting certain lands belonging to Sarah J. Walton to the payment of a debt alleged to be due to Lucy E. Wright. The complainants filed as exhibits to their bill two promissory notes given by C. A. Walton to Lucy E. Wright, and copies of C. A. Walton's accounts with H. Wright & Co., and with Wright & Edrington. The defendants answered; and when the cause came on for final hearing, the chancellor dismissed the bill. From the decree of dismissal the complainants appealed. The other facts of the case, necessary to be known, are given in the opinion of the court.

*T. C. Catchings*, for the appellants.

1. In a suit against a married woman to enforce a contract for plantation supplies, the merchant is only required to establish the contract, and to show the amount of supplies furnished. It is not necessary for him to show how the supplies were used. It is the contract for supplies which the statute declares may be enforced and satisfied out of a wife's separate estate. The liability of her estate springs from, and is to be determined by, the contract for the supplies, and not the use which is made of them. The wife's separate estate may be bound in the same way for family supplies as for plantation supplies, except that the contract for family supplies must be made by the wife, or by the husband with her consent; while the husband may bind his wife's estate for plantation supplies without first obtaining her consent. Code 1871, sect. 1780.

2. It is immaterial whether the supplies furnished under such contracts consist of meat and bread, or money. One is as necessary in the cultivation of a plantation as the others. In many cases, nothing but money will answer the purpose of the planter.

3. As to contracts binding the separate property of married women, see *Robertson* v. *Wood*, 12 Smed. & M. 490; *Robertson* v. *Bruner*, 2 Cushm. 244; *Porter* v. *Silliman*, 44 Miss. 272.

4. The cases of *Viser* v. *Scruggs*, 49 Miss. 709, and *Bowman* v. *Helm* (MS. op.), which hold that one who lends money to a married woman takes the risk that she will use it for the purposes for which, under the statute, she may contract, are not supported either by reason or the language of the statute.

*E. E. Baldwin*, for the appellees.

Is Mrs. Walton's separate estate liable for the money advanced to her husband by the various firms in which Hamilton Wright was a partner? She denies that the money was used for the benefit of her separate property, or for her family. The burden of proving that the money was so used rested upon the complainants below, and they failed to make such proof. Therefore, the chancellor properly held that Mrs. Walton's separate estate was not bound. See *Viser* v. *Scruggs*, 49 Miss. 705; *Bowman* v. *Helm* (MS. op.).

SIMRALL, C. J., delivered the opinion of the court.

At the close of dealings between Hamilton Wright, a merchant at Vicksburg, and Charles Walton, his customer, two notes were given by the latter, payable (at the request of the former) to his wife, Lucy.

The accounts had extended through a period of several years, and were had with firms of which Hamilton Wright was a partner, and in part with himself, Stiles being his first associate, succeeded by Edrington. As these changes occurred, Walton's account was transferred from one firm to another. At the date of the settlement, Wright represented to Walton

that the connection between himself and Edrington had been, or was about being, dissolved ; and that this account, in the division of assets, had fallen to him.

The course of the transactions between Walton and Wright were such as were usual between a merchant in the city and his customer in the country, except that much more was brought into their dealings than was common between a planter and his commission-merchant. At the beginning of the connection, Walton was a retired merchant, his affairs unsettled, and he kept a desk in the office of Wright & Co., for the convenience of winding up his business.

His wife had a plantation in Hinds County, managed by him. The crops of cotton were consigned to Wright & Co., or Wright & Edrington, as the firm might be for sale ; and groceries and supplies generally, for the family and the plantation, were furnished by them on Walton's orders. Cash was paid and drafts honored without question or inquiry as to the use to which the money or the goods were to be put. Mrs. Walton seems to have committed her plantation, and all that was upon it, to the entire discretion of her husband, permitting him to dispose of the crops as he pleased, without inquiry as to whether he was disposing of them prudently or not. She knew that Wright was his commission-merchant, but seems to have had no information as to the state of the accounts, whether her husband was a creditor or debtor. Walton was not altogether destitute of resources. He owned two policies of insurance, which were transferred as security for the notes. In his accounts were many things having no connection with plantation or family necessaries. He was advanced $4,000 for a cotton speculation, and was charged with his part of the loss. He drew money to meet the expenses of making and burning brick, to pay debts to sundry persons. He dealt with the wife's property and its income as if it were his own absolute property.

The question is, whether Mr. Walton's notes are chargeable on the wife's property, and if so, whether for the whole

amount, or less ; and by what *criteria* is Mrs. Walton's property liable.

She admits that her husband had her consent to buy whatever was needful for the plantation and the family, but disputes and contests the creditors' right to charge more than that on her property.

The married woman's law places her property under her exclusive control and disposition, except that sales and conveyances and encumbrances must be the joint act of herself and husband, and except, also, that the husband alone may make " contracts " for supplies for the wife's plantation.

Let us see if other parts of the statute afford any aid in ascertaining the meaning of the words " contracts for supplies for her plantation."

After marriage, the wife may acquire property, among other modes, by deed of conveyance, recovery, etc. She may be the *recipient* of property, in any of the modes by which it may be transferred from one person to another. She may be a voluntary donee or a purchaser. If sect. 1778 of the Code stood alone, it might be argued with plausibility that, since she may acquire property " by deed of conveyance," she must also have the implied right to enter into an engagement to pay for it *in futuro*.

But purchases are negatived by the next section, — sect. 1779 : " And any married woman may purchase, etc., with her own money."

Sect. 1780, after stating that a wife may rent her lands, loan her money, and employ it in trade or business, declares that she, jointly with her husband, or either of them, may make contracts for supplies for her plantation.

She must have a " plantation " before she or the husband can make a " supply " contract. *Her plantation* is the predicate of the power to make the contract. A false representation that she has such property will not estop her from averment that the *fact* was otherwise.

The statute does not allow her to obligate herself to pay for

property bought on a credit. Such an obligation could not be enforced. But there is a class of obligations she can assume ; among them are contracts for "supplies for plantations." The Legislature intrusted the husband (having regard to the ordinary need of the agriculturist) with power to bind her property for "supplies."

Primarily, the word was used by the law-maker to indicate all those things required and used by the planter in the production and preparation of the crops for consumption or for sale. If it be said that the family must be supported, and the term embraces food and raiment for them, the answer is furnished by a later part of the same section, namely, that supplies, necessaries, and conveniences for the family are not necessarily chargeable on the wife's property ; she is not liable for them unless she bargains to be, or unless her husband buys them on her account, or with *her consent*. The purchase must be by her, and on her credit ; the husband can act for her, as agent, "with her consent," and not otherwise.

The language is, "all contracts made, etc., for family supplies, * * * wearing-apparel for herself and children, household furniture, carriage and horses," etc. The contract must be for the *things themselves*, and, taking the entire text with which the words quoted are connected, we would gather the idea to be, that whatever constituted food, raiment, education, furniture, and such like, were the class of things for which the wife may contract. If she has not the money, she may incur debts for these, and for buildings on her land, materials therefor, and work and labor thereon.

Taking into view the entire body of the statute, we deduce this legislative will : Whilst the married woman may enlarge her estate by purchase, she must do so with ready money ; she shall not subject her property to obligations solvable in the future. That is an extent of capacity with which it would not be prudent to intrust her. But if she owns lands employed in agriculture, she or her husband may make contracts for "plantation supplies ; " and if she has not money,

she or he may buy on a credit, and payment be enforced out of her estate.

She may contract for these supplies just as she can for the building of a house, or for work done for the improvement of her estate, — as, fencing, ditching, or the like.

But it is said that money is as much a " supply," a " necessary," as grain, a mule, or a plow. If, therefore, the " contract " be to reimburse money borrowed to pay for plantation supplies, — as, to buy grain, or mules, or husbandry implements, — it is within the statute. The argument is, if the " money " is got for the " purpose " of paying laborers, or buying " supplies," the contract is good. Although the money may not be so used, the proposition is that the husband may borrow money for such purpose ; yet, if he directs it to a totally different purpose, it does not affect the contract, — the lender is not bound to see to its appropriation. It is said that it is the " contract " which the statute makes good, and not the actual use of the supplies ; and that the creditor does not lose his debt if the wife can show that the grain, or mule, or implements were never taken by the husband to her farm, and that the seller is not bound to see that the plantation gets the benefit of them.

The statute makes the husband the agent (general agent) to buy supplies. When, therefore, he proposes to procure those things, which, according to usage and custom, are necessary for the prosecution of agricultural operations, he presents himself as dealing for his principal. His relation as husband, and the use to which the things are to be put, suggest the scope of his authority. His statutory agency is limited to contract for supplies.

In *Herman & Co.* v. *Perkins*, 52 Miss. 815, the objection was, that part of the goods were not " necessaries " for the cultivation of a farm or plantation, as used in the act of 1867 for the " encouragement of agriculture." We felt that the subject was beset with difficulties, and without undertak-

ing to enumerate or classify what were " necessaries," we referred the determination of that question "to the usages and customs of the agricultural interest," taking into the account the system of agriculture as we actually have it. Perhaps a more definite rule could not be laid down.

Now, the statute of 1871 intends that the husband may contract for the same sort of supplies; and we must by the same rule ascertain what they are. The observation on the case cited is applicable to the one now under consideration: " Where the farmer has in good faith taken up the goods on the faith of the lien, and it is questioned whether this article or that falls within the law, there ought to be evidence that the things were not needed for farm purposes, or that they were not fit or adapted to that use."

The interpretation of the married woman's law has been uniform, that the wife cannot borrow money though she state that it was procured to be expended for the support of her family or for supplies for her plantation. The statute does not confer capacity to borrow money. But it was ruled in *Bowman* v. *Helm* (MS. op.), and *Viser* v. *Scruggs*, 49 Miss. 706, that if her liability attached, it was by reason of the use of it for the maintenance of her family, improvement of her estate, or some other such like purpose. The advancer of the money was by such use brought within the equity of the statute. Those cases were deliberately followed in *Reed* v. *Coleman*, 52 Miss. 838. There, Wood and wife executed ten notes for $5,000 each, with mortgage, to secure advances of money and supplies to be thereafter made to Mrs. Wood. It was held that the *notes* imposed no liability on her; but if all or any part of the money was actually used for any of the purposes for which she could contract under the statute, to that extent there would be a valid debt by virtue of such use.

The principle ruled was, that a note given by a married woman for future advances of money and supplies for plantation and family does not bind her. But, in so far as sup-

plies were got and money used for her benefit, as explained in *Viser* v. *Scruggs, supra,* she would be liable, and the security be enforced.

It by no means follows that because the wife has separate property she is liable for household and family supplies. The fortune of the wife does not relieve the husband from his duty to maintain the family. The *onus* is not devolved on the wife unless she consents to assume it. The question so warmly contested in *Guion* v. *Doherty,* 43 Miss. 531, was whether the goods were bought on the credit of the husband, or on the credit of the wife with her consent. The defence was, that although Mrs. Guion had a separate estate, she was not responsible unless the goods were bought on her account, she consenting thereto. This court ruled that the issue was properly left to the jury by the court. That was followed by *Cook* v. *Ligon,* 54 Miss.

The husband is constituted agent, by law, for a limited purpose. To provide a certain class of necessaries, he deals with the merchant, as agent, and can bind his principal within the scope of his power. Nor is the merchant any more bound to see that the horse, or mule, or implement is carried to the wife's farm, and there used, than he is to look after the use of one hundred barrels of flour which an agent, appointed by his principal, is authorized to buy for a particular use. If the agent, after the purchase, converts the flour to his own use, the seller is not affected by it; that is a question between the principal and agent, and is no reason why the principal should not pay the debt which he authorized the agent to make.

So, the husband is clothed with statutory power to " contract " for his wife for those things needed on her farm. If he buys a line of goods suitable for that use, and ordinarily so applied, his contract is within his power, and liability at once attaches to the wife's property; and it is no defence to plead that her husband misapplied the goods, and she got no benefit from them.

But when the demand is made of the wife for money paid

to the husband in person, or on his orders and drafts, to the extent of thousands of dollars, the inquiry assumes another aspect. Would the express promise of the wife to refund bind her? Second, if she had given previous consent to the merchant that she would repay money advanced to the husband, would it bind her? And, lastly, if she had thus become indebted to the merchant in a direct advancement to herself, in payment of her orders, would she be bound? And if so, in any of these circumstances, upon what precise ground? To borrow money is not one of the things that the statute gives her power to do, — certainly not in terms. It is not a contract for " supplies " or " necessaries," in the sense of the statute.

When it is said, as in *Viser* v. *Scruggs*, that the *use* of the money may create a liability, no other idea is conveyed than that, if she lays it out for food and raiment for her family, or to build a house, she has made a lawful use of it, and the advancer of it equitably occupies as meritorious ground as would the merchant if he had sold his goods on a credit, or the mechanic if he had erected the house on the same terms.

The rule is, the wife cannot make a " contract " to repay borrowed money ; but she may get such benefit by the use of it for certain purposes, that the courts will hold her bound to refund it.

The decree is affirmed.